STATE OF VERMONT

ENVIRONMENTAL COURT

|   |   |   |
|---|---|---|
| | } | |
| In re Appeal of McGrew, <u>et</u> <u>al.</u> | } | Docket No. 199-10-04 Vtec |
| | } | |
| | } | |

<u>Decision and Order</u>

Appellants Barbara McGrew, Daniel Fivel, and Jowall Limited Partnership appealed from a decision of the Development Review Board (DRB) of the City of Burlington regarding a project involving property at 114 College Street, 126 College Street and 95 St. Paul Street. Appellants are represented by Andrew R. Strauss, Esq. and Norman Williams, Esq.; Additional Appellant Leonora, LLC is represented by Robert C. Roesler, Esq.; Appellee-Applicant Investors Corporation of Vermont is represented by Carl H. Lisman, Esq. and Christine A. Jensen, Esq.; and the City is represented by Kimberlee J. Sturtevant, Esq.

After a decision on motions for summary judgment addressed certain issues, an evidentiary hearing was held on the remaining issues in this matter before Merideth Wright, Environmental Judge. The parties were given the opportunity to submit written memoranda and requests for findings. Upon consideration of the evidence and of the written memoranda and requests for findings filed by the parties, the Court finds and concludes as follows. To the extent any proposed findings of fact and conclusions of law are incorporated in this decision, they are granted; otherwise, they are denied.

Appellee-Applicant owns three adjacent parcels of property at 114 College Street (with frontage on Pine Street and on College Street), at 126 College Street (with frontage on College Street), and at 95 St. Paul Street (with frontage on College Street and on St. Paul

1

Street), in the Central Business District zoning district. Appellant proposes to construct a ten-story mixed-use building on the 114 College Street parcel, including a bank automatic teller machine accessed by car, and two commercial offices on the ground floor, fifty residential units, and associated parking located within the building beginning on the ground floor and extending two floors below the ground floor. Twelve of the residential units are reserved for low- and moderate-income housing.

One of the commercial areas is 131 square feet in area, to accommodate an automated bank teller machine. No interior lobby or office space is associated with the machine; it is solely proposed to be accessed by the public from outside of the building.[1] The other two commercial areas are offices: one is 1,242 square feet in area and the other is 547[2] square feet in area.

The building is proposed to have a flat roof, on which a 160-square-foot penthouse structure (8' x 20') is proposed to be located to house mechanical equipment necessary to be located on the roof, including the top of the elevator shaft. The roof is 7,792 square feet in area, so that the penthouse structure covers only about two percent of the area of the roof. The penthouse structure is proposed to be located centrally in the roof, to minimize its visibility from the street. It is designed with a brick veneer and a fiber cement cornice, and a peaked, standing seam green metal roof, ten feet in height at the peak. It is similar both in design and materials to the design and materials used in the building itself. It will blend well into the overall design as an architectural feature of the building, even if seen from a higher elevation than the building roof.

---

[1] It is proposed to be accessed by vehicles located in the alley on the north side of the building. The proposed plans do not show any pedestrian access to the ATM.

[2] The 960-square-foot office space shown on an earlier plan was reduced to 547 square feet in the plan presented to the Court in evidence as the current application, with the remaining space being allocated to mechanical building functions.

Bicycle lockers are provided on the ground floor of the proposed new building. Over 70% of the households in the census district corresponding to the Central Business District zoning district own fewer than two automobiles per household (that is, own either a single automobile or do not own an automobile). Data suggesting that owner-occupied households in the downtown area own approximately 1.5 automobiles per household do not distinguish between owner-occupiers of single-family houses and townhouse condominiums, on the one hand, and those owning apartment condominiums such as those proposed in this case.

The College Street Shuttle provides free shuttle service from the waterfront to the University of Vermont and medical center, with a stop adjacent to the proposed new building. The Chittenden County Transportation Authority provides extensive local bus service from a terminal at Cherry and Church Streets, a few blocks away. The proposed new building is located within a reasonably short walking distance of necessities and amenities, including grocery stores, drug stores, schools, restaurants, retail stores, entertainment, and public parks, including the waterfront, and is centrally located for downtown employment opportunities. Several public parking garages are also located within a reasonable walking distance of the proposed new building. Evidence was not presented regarding the timing of any shared-use opportunities for parking in the existing parking garage on the merged site, or in any others of the public or private parking facilities in the area.

The proposed new building does not provide an off-street loading area. An on-street loading area is located nearby along College Street.

The parking garage proposed as part of the new building provides sixty-four

parking spaces within the garage, plus five[3] so-called stacking spaces for users of the ATM. Eleven of the sixty-four spaces will be reserved for public parking, and three[4] spaces are provided for the two office areas. The remaining fifty[5] spaces are proposed to be reserved for the building's residential units. While the proposed garage or alley is shown as connecting to the existing parking structure in the adjacent building associated with the project, that connection is proposed to be blocked by a chain and to be used only for emergency access and maintenance.

As proposed for consideration by the Court, the lowest level of the garage contains 24 parking spaces, all located below the ground floor of the building and below grade. Four of the spaces are eight feet in width and designated for use by compact cars; two other spaces are designated as accessible spaces, and are located on a flat portion of the garage. The southwesterly one of these spaces is accessible for wheelchair use, with access to the elevators without traversing an excessive slope. While the northwesterly one of these spaces is of the proper width to be accessible, it is not suitable for wheelchair use, as access

---

[3] Five spaces are available along the north side of the building for cars to wait to proceed to use the ATM at the Pine Street end of the building, separate from the pass-by lane for egress from the garage and for bypassing the ATM if too many cars are stacked up to wait for them to proceed. While Appellee-Applicant argues that more than those five spaces are available, they are not in fact available. If Appellee-Applicant is referring to the public spaces in the garage, those spaces must be reserved for public use to qualify for the height bonus under §5.3.15(a)(2). If Appellee-Applicant is referring to the north-south segment of the alley, to the south of the garage entrance, additional vehicles waiting there for the ATM would block access to the garage entrance. We therefore treat this as Appellee-Applicant's request for a waiver of one of the six required ATM spaces.

[4] Appellee-Applicant is requesting a waiver of three of the six spaces that would be required based on the square footage of each of these offices.

[5] Appellee-Applicant is requesting a waiver of fifty of the hundred spaces that would otherwise be required.

to the elevators would require the diagonal traverse of an 8% slope with no handrail assistance. A ramp for use by persons in wheelchairs should not exceed a 5% slope unless handrails are provided, in which case the ramp should be used directly up or down the slope and not diagonally across the slope.

As proposed for consideration by the Court, the middle level of the garage contains 21 parking spaces, all located below the ground floor of the building and below grade. Four of the spaces are eight feet in width and designated for use by compact cars; three other spaces are designated as accessible spaces, and are located on a flat portion of the garage. The southwesterly one of these spaces and the space adjacent to the elevators are both accessible for wheelchair use, with access to the elevators without traversing an excessive slope. Appellee-Applicants also propose to enlarge the area adjacent to the accessible space in the southwestern[6] corner to be eight feet in width, by reducing the size of the tenant storage area next to that space, so as to provide enough room to qualify the space as a van-accessible space as defined by the federal Americans with Disabilities Act Accessibility Guidelines[7] (ADAAG) standards. The third of the proposed accessible spaces proposed for the middle floor of the garage, in the northwest corner, is of the proper width to be accessible, but is not suitable for wheelchair use, as access to the elevators would require the diagonal traverse of an 8% slope with no handrail assistance.

As proposed for consideration by the Court, the upper level of the garage begins at

---

[6] There was some confusion about the location of this space, but as the tenant storage in the northwest corner is separated from the accessible space by a stairwell, it appears to be the southwest corner that was meant. If it would be possible to change the alignment of the northwest stairwell, it might be possible to alter the location of the accessible spaces with respect to that northwest corner, but no such change appears to be proposed. In any event, as proposed, the northwest space does not have appropriate access to the elevators.

[7] 28 C.F.R. Pt. 36, App. A.

grade and contains 19 parking spaces, including all eleven of the spaces reserved for the public. Of these spaces, nine are at grade or only partially below grade, and ten are entirely below grade and below the ground floor of the occupied portion of the building, so that a vehicle parked in the space would be below grade. Although only two spaces are labeled as "compact" car spaces, it appears that four of the spaces are eight feet in width and designated for use by compact cars, by comparison with the design for the two lower floors of the garage. Similarly, although only one of the spaces on the upper floor of the garage is labeled as accessible on the plans, two spaces appear to be designed as accessible, by comparison with the design for the two lower floors of the garage. These spaces are each located on a flat portion of the garage. However, the plans do not show any access to the elevator or lobby of the building from the upper floor of the garage, and therefore neither proposed accessible parking space would qualify as accessible, as there does not appear to be any wheelchair-accessible access to the outside of the building from the upper portion of the garage. If there were access to the outside, the elevators or the lobby from the upper floor of the garage, we would have to examine the route of access to determine whether either of the proposed accessible spaces is in fact accessible for wheelchair use, with access to the elevators without traversing an excessive slope.

All the parking spaces in the garage are twenty feet in length, except the twelve designated compact spaces which are each 18[8] feet in length. Other than the proposed accessible spaces, all the parking spaces are nine feet in width, except the twelve designated compact spaces which are each 8 feet in width. All the parking is 90-degree angled parking, that is, any parking on a sloped section of the garage is across the slope rather than along it. Some of the nine-foot-wide spaces are affected by columns which intrude

---

[8] Most of these spaces have room to be 20 feet in length, although due to their width they do not qualify as standard spaces. The additional length does give the compact cars more maneuvering room to access the space.

6

into the space by approximately five inches. Although the columns make it more difficult to park, and may require jockeying maneuvers, all the spaces affected by columns are useable spaces for standard sized automobiles.

A twenty-foot-wide aisle is provided which is adequate to allow two automobiles to pass each other at the very slow speeds appropriate for maneuvering within a private residential parking garage, even though at the corners one car would have to wait until the other car had turned the corner. The sloped ramps with the garage are at an 8% slope, which does not cause a problem for driving at the slow speeds necessary for the garage, and does not cause a problem for opening and closing doors when parking across the slope. However, an 8% slope (one foot of rise over a length of twelve-and-a-half feet) is too great a slope for a person using a wheelchair, unless the ramp is equipped with handrails and is not traversed diagonally.

All the parking spaces except for the last two spaces adjacent to the east wall at the bottom of the garage may be accessed, even if vehicles are parked in the adjacent spaces, and even though several jockeying movements may be necessary to enter or exit some of the parking spaces. In general, when spaces are assigned to the residents of a building it is not unreasonable for them to become familiar with the specific maneuvers required to access the particular spaces. However, it will not necessarily be possible to access the last two spaces next to the wall at the bottom of the garage as the garage is now designed;[9] that is, if standard-sized vehicles are parked next to those spaces it may be impossible to enter or exit those spaces with standard-sized cars, even with several maneuvering movements.

---

[9] According to Table 10-D, a compact space 18 feet in length and accessed by 90-degree parking requires an aisle (minimum back-up length) of 20 feet, while a standard 20-foot-long space requires a minimum back-up length of 24 feet. Evidence was not presented as to whether excavation under either the northerly or the easterly alley could provide sufficient room to make these spaces useable, or could provide a turnaround space at the end of that aisle.

The site is designed so that vehicles enter the site, whether to use the garage or the ATM, by a one-way entrance into a one-way alley on the westbound side of College Street. The design of access to the site replaces the two existing College Street curb cuts with a single curb cut located as far from the intersection of College and Pine Streets as possible, due to the location of existing buildings. The entrance to the garage is a left turn from this alley, just before the alley turns the corner of the building towards the west. The exit from the garage is a left turn into this alley, just before the alley turns the corner of the building towards the west. At the corner of the building, a vehicle may enter the queuing lane for the ATM, or may enter the pass-by lane to exit the site onto Pine Street. The design of the exit from the site replaces the two existing Pine Street curb cuts with a single curb cut located as far from the intersection of Pine and College Streets as possible, at the edge of the property.

The maximum number of vehicles entering or exiting the property is twenty in the peak hour, or one every three minutes. The reduction in the number of curb cuts will reduce the potential places for conflicts between vehicles and pedestrians. The entrance to the alley leading to the garage and the ATM will have adequate visibility to avoid conflicts between pedestrians and vehicles entering the site. However, at the exit, the north wall of the building will block visibility between pedestrians and vehicles exiting the site from the ATM location. Because it is a full wall rather than a low, decorative stone wall, it will block visibility to a greater degree than the former wall at the exit, although the pass-by lane will have better visibility. The existing garage on the merged property contains fifty spaces on its upper level, all above grade, and fifty-two spaces on its lower level. (Exhibit 14, sheets SP-1 and SP-2). Vehicles in thirty-five (Exh. 14, sheet SP-1) of the fifty-two spaces on the lower level would be entirely below grade.

We determined early in the pretrial proceedings that Question 1 of the Statement of Questions, whether the proposed 50-unit residential building meets the criteria for approval in the Zoning Ordinance, did not raise any additional sections of the Zoning Ordinance than those specified in the remaining eight questions. We address each of the questions in turn.

Density: Questions 2, 3, and 4 of the Statement of Questions

Question 2 was resolved on summary judgment, concluding that nothing in the Zoning Ordinance precludes the merger of the three parcels, so that density may be calculated for the merged lot as a whole.

Under §5.2.6(e), a project is entitled to use either of the two listed methods of calculating density, whichever yields the greater result, if it "has at least 50% of its parking spaces located in an underground structure." The term "underground structure" is not itself defined in the Zoning Ordinance, nor is the purpose of this provision explicitly stated in the Zoning Ordinance. The BOCA National Building Code defines "underground structure," but in the context of a structure's use for human occupancy; therefore that definition does not assist the Court in this instance. The reference work The Dimensions of Parking (4th Ed.), published by the Urban Land Institute and the National Parking Association, only defines the term "underground garage," which is not the term used in the Zoning Ordinance. We therefore look to whether any other sections of the Zoning Ordinance can assist the Court, when read together with §5.2.6(e).

The definition and use of the term "surface parking" in the Ordinance is helpful in determining the meaning of "underground structure" in the Ordinance. "Surface parking" is defined in the ordinance to mean "parking facilities that are at grade and uncovered or

9

not within a structure."[10] This definition was added in 1996 for use in the then-new §3.2.7 establishing the Champlain College Core Campus Overlay zoning district, and was subsequently used in §§3.2.8 and 3.2.9 as well, establishing, respectively, the Institutional Core Overlay District and the Trinity Campus Overlay District. In each of these overlay zoning districts, the creation of new outdoor surface parking spaces is prohibited, unless offset by the elimination of existing outdoor surface parking spaces. It is evident from the disfavored status of new outdoor surface parking, read together with the favored status of (height bonus available for) projects in which more than half of the parking spaces are in an underground structure, that the underlying policy of the Zoning Ordinance is to avoid occupying the land surface with automobile parking, especially in the denser downtown areas.

While it would be preferable for the Zoning Ordinance to make these definitions consistent and to explicitly state the City's policy of avoiding surface parking lots in its most densely used districts, we can nevertheless read these sections of the ordinance together (in pari materia) to determine that the City's staff's interpretation is a reasonable one: to measure the 50% rule by determining not that the pavement of the spaces must be underground, nor that the entire structure must be underground, but that at least 50% of the standard vehicles parked in the available spaces in the structure must be underground.

Applying that methodology, the existing parking structure provides 102 spaces, of which 35 are below grade in an underground structure, while the proposed new parking

---

[10] While the definition lacks guiding punctuation, ordinance language is not created to be superfluous. To avoid a superfluous result, surface parking spaces must be those that are in the following two categories: those that are at grade and uncovered, or those that are at any grade (i.e., even in an excavated or technically below-grade area, such as behind a building built on a sloping lot) if they are not within a structure.

garage provides 64 spaces,[11] of which 55 are below grade in an underground structure. The five ATM spaces are at grade. The project therefore provides a total of 171 spaces, of which 90 (52.6%) are below grade in an underground structure. Even if the lowest two spaces are not counted, the project would meet the 50% requirement by providing a total of 168 spaces, of which 88 (52.4%) are below grade in an underground structure.

As under §5.2.6(e) the project is entitled to use the Floor Area Ratio method of calculating density, applied to the merged parcels as a whole, the proposed project as a whole would be entitled to 110 units, based on a total of 55,321 square feet of area. The site contains the equivalent of 39 commercial units, so that an additional 71 units would potentially be allowed under the density calculation. At fifty residential units and the commercial equivalent of two units (or three if the ATM is counted as a unit), the proposed project meets the density requirements of §§5.2.1 and 5.2.6(e) of the Zoning Ordinance.

Height: Questions 5, 6 and 7 of the Statement of Questions

Question 5 was resolved on summary judgment, concluding that the proposed project meets the requirements for a height bonus under §5.3.15(a)(1), as at least 20% of the units are affordable to low and moderate income households as defined by state and federal regulations. Question 6 was resolved on summary judgment, concluding that the proposed new building also meets the requirements for a height bonus under §5.3.15(a)(2), as it provides public parking spaces in an amount no less than 10% above the total parking requirements of the new building. The required number of public parking spaces remains eleven spaces, which is the number proposed to be provided by the project. After application of both height bonuses addressed in Questions 5 and 6, the new building is

---

[11] But see discussion below of the conditions under which the lowest two spaces may be counted.

entitled to be constructed to a height of 100 feet.

Section 5.3.13 makes provision for certain exceptions in all districts to the height limits otherwise applicable. Subsection (a) allows additions and new construction, on parcels with existing grandfathered buildings that exceed the otherwise-applicable thirty-five foot height limit, to be built to the height of the existing grandfathered building. This section is inapplicable to the present project, as it qualifies for heights in excess of that thirty-five foot limit under other provisions of the Zoning Ordinance.

Thus the remaining issue as to the height of the new building raised by Question 7 of the Statement of Questions is whether the so-called penthouse structure designed to enclose the rooftop mechanical features qualifies for exclusion from the height measurement under §5.3.13(d). That section exempts "ornamental and symbolic" architectural features, including "towers, spires, cupolas and domes, where such features are not used for human occupancy or commercial identification," if those features do not exceed ten percent of the total roof area, and provided that the architectural feature is subject to design review.[12] The corresponding design review sections, §§6.1.10(g) and 6.1.11(g), requires special features such as machinery and equipment to be integrated with the overall design of the project, and, if located on the rooftop, to be "arranged so as to minimize visibility from any point at or below the roof level of the subject structure and to be either enclosed by the outer building walls or parapets, or screened, or "designed in themselves so that they are balanced and integrated with respect to the design and materials of the building."

The 160-square-foot penthouse structure meets the coverage limitation of §5.3.13(d),

---

[12] The original rooftop penthouse was reviewed by the Design Advisory Board; the changes to it do not need to be considered by that advisory board, as the design review function itself under Article 6 is one performed by the DRB, and hence by this Court in this de novo appeal.

12

and is located centrally in the roof, to minimize its visibility from the street, meeting the design review provisions of §§6.1.10(g) and 6.1.11(g). As an architectural feature of the roof, it is designed with a brick veneer and a fiber cement cornice, and a ten-foot-high, peaked, standing seam green metal roof. Its design as well as its materials are similar to that of the building, and it will blend well into the overall design as an architectural feature of the building, even if seen from a higher elevation. It therefore qualifies as an ornamental architectural feature entitled to be excluded from the building's height measurement under §5.3.13(d).

Parking: Questions 8 and 9 of the Statement of Questions

Under §10.1.19, all of the requirements of the parking regulation contained in Article 10 may be reduced by the DRB, and hence by this Court in this de novo proceeding, "to the extent that the applicant can demonstrate that the regulation is unnecessarily stringent for reasons of (a) unique use times; (b) shared or dual use; (c) availability and projected use of alternate transportation modes, . . . ; and/or (d) anticipated reduction in vehicle ownership in connection with affordable housing developments." Such waivers may not reduce the number of spaces below 50% of the required spaces, except that waivers may exceed 50% in relation to the items listed in §10.1.20, including affordable housing units and off-street loading requirements. Further, under §10.1.6, "where the computed parking requirement for a nonresidential use in any commercial[13] district" is ten or fewer spaces, the DRB (or this Court) "may waive all or part of such computed requirements." It is not clear whether this latter requirement only pertains to existing structures used entirely for commercial purposes, as suggested by its title. However, neither party requests the Court to apply this section in considering the requested waivers, and we have not considered it further.

---

[13] Under §3.1.7 the central business district is defined as a commercial district.

Adequacy of number of parking spaces

No off-street loading space is required for the building, as it does not contain any of the use categories ("retail businesses and services," "wholesale and industrial," and "bus and truck terminal") for which a loading space is required under §10.1.9 and Table 10-B of the Zoning Ordinance. Even if one were required by §10.1.9, it would be appropriate to waive that requirement under §10.1.20(d), as a loading space is not necessary for the uses proposed for the building, especially in light of the existence of a nearby on-street loading space.

Under Table 10-A, the number of parking spaces required for the project, in the absence of a waiver, would be two spaces for each of the fifty residential condominium units, six spaces for the drive-up-only[14] ATM, four[15] spaces for the 1242-square-foot office and two spaces for the 547-square-foot office, totaling 106 spaces in the garage, plus the six spaces associated with the drive-up ATM, for a total of 112 spaces required for the building. In addition, to qualify for one of the height bonuses, Appellee-Applicant must provide an additional 10%, or eleven spaces, for the public. Appellee-Applicant proposes to provide 64 spaces in the garage, including the eleven public spaces in the garage, and five[16] stacking spaces in the alley associated with the ATM. Appellee-Applicant therefore has requested a waiver of fifty (50%) of the parking spaces required for the residential uses

_____

[14] As the ATM is a drive-up window only, these spaces are presumed to be stacking spaces for drivers to wait in their cars for the ATM to be free, and not subject to the general prohibition against tandem spaces found in §10.1.16.

[15] The practice of the City is to round down in this instance.

[16] While Appellee-Applicant argues that six so-called stacking spaces are provided in the alley, in fact only five spaces are available along the north side of the building beyond the entrance of the garage, without blocking the pass-by lane or the garage entrance.

in the building, has requested a waiver of three (50%) of the parking spaces required for the office uses in the building, and, by showing only five stacking spaces on the site plan associated with the ATM, has effectively requested a waiver of one (16.7%) of the six parking spaces required for the ATM use.

Appellee-Applicant has demonstrated that a waiver of three of the parking spaces otherwise required for the office uses in the building is warranted, due to the downtown location of the project and the availability of nearby public parking for incidental visitors or deliveries to those offices during office hours. Similarly, Appellee-Applicant has demonstrated that five stacking spaces are sufficient for the ATM window in this downtown location, due to the availability of the pass-by lane for vehicles to exit the alley if the queue for the ATM is too long.

However, Appellee-Applicant has not demonstrated that the requested waiver of all fifty of the parking spaces required for the residential use is warranted; although evidence may exist to support such a waiver, it was not presented to the Court. That is, Appellee-Applicant demonstrated the availability of alternate transportation modes (bus and bicycle) but presented no evidence about the projected use of those modes by the projected residents of the building. Appellee-Applicant presented no evidence to support the shared or dual use of any of the parking spaces, either in the proposed garage or in the existing garage. At best, the evidence presented on vehicle ownership in the downtown area of Burlington, when adjusted for the income levels associated with the market and affordable units, suggests that absent any vehicle limitation covenants or restrictions, the residents will own approximately 1.4 vehicles per unit, which would support a waiver of 30 of the 100 spaces otherwise required.

Thus, on the basis of the evidence presented and without a proposed covenant or lease provision restricting building residents to one vehicle or parking space per unit, insufficient evidence was presented to warrant waiver of all fifty spaces requested. A

15

waiver of thirty spaces is hereby granted, without prejudice to Appellee-Applicant's requesting a limited remand to allow it to apply to the DRB for a waiver of the remaining twenty spaces, or to apply for an additional garage level in the proposed building, or alterations to create additional parking spaces in or below the existing garage. Any such waiver request would have to be supported by appropriate evidence regarding the projected use of alternate transportation, the shared or dual use of any of the available spaces in either the existing or the proposed garages, the anticipated reduction in vehicle ownership due to the twelve affordable units, or any proposed vehicle limitation covenants or restrictions. If any further appeal were to result from a DRB decision on such a renewed waiver request, or on proposals for additional parking, this Court would expedite the appeal under the provisions of V.R.E.C.P. 2(b), so that only a supplemental hearing on those new issues or proposals would be necessary.

Adequacy of layout and design of garage to meet accessibility and safety requirements

The Zoning Ordinance contains specifications for accessible parking spaces, §10.1.14, but does not require a set number of such spaces. The design review criteria, §6.1.10(d) and the site plan review criteria, §7.1.6(b), merely require a review of the adequacy of provisions for accessibility. The state statute governing accessibility requirements for public buildings (including multi-family residential buildings such as this one), 20 V.S.A. §2904, refers to the requirements of the federal ADAAG standards. Under the ADAAG, three of the 64 spaces would be required to be accessible spaces. Of the seven spaces proposed as accessible spaces in the project plans, the three in the northwest corner of each floor fail to qualify as accessible spaces, due to the lack of access to the elevators without traversing an excessive slope, and the one in the southwest corner of the upper floor of the garage may or may not qualify, depending upon whether access to the elevators or to the lobby of the building is to be provided from that upper floor of the garage. However, even

16

without considering those spaces, the three required accessible spaces are provided, including one (in the southwestern corner of the middle garage level) with enough space beside it to qualify as a van-accessible space.[17]

Although parking in some of the spaces, including those affected by columns, may require several jockeying maneuvers, all the spaces except the lowest two, against the eastern wall, are functional, especially as most of the spaces will serve the relatively low turnover needs of the residents of the building. That is, the evidence supports a waiver of the nine-foot width for the spaces affected by columns. The evidence also supports an eight-foot width for the compact car spaces, which does not require a waiver due to the provision for the eight-foot width in Table 10-D.[18] The back-up length (aisle width) of twenty feet is sufficient for both compact and standard cars, pursuant to Table 10-C, except with respect to the lowest two spaces, discussed below. An area to turn around at the lowest end of the garage aisle is not necessary, as room is available at each corner landing to make a broken U-turn.

However, the last two spaces on the lowest level, next to the eastern wall, are not functional, that is, they cannot be accessed as designed if vehicles are parked in the adjacent spaces. Accordingly, to obtain approval of those spaces, Appellee-Applicant either will need to obtain a waiver of an additional two spaces, which might be available under §10.1.20(a), or will need to propose changes in the plan to provide either a greater back-up length (aisle width) of those spaces, or some maneuvering room to the east of

---

[17] We do not here address whether public access to that van-accessible space is required under any state or federal law or regulation; it does not appear to be required by the Zoning Ordinance.

[18] The City may wish to reconcile the nine-foot width for compact car spaces in Table 10-C with the eight-foot width for compact car spaces in Table 10-D, to avoid this confusion in the future.

17

those spaces excavated out of the area below the alley. As with the ruling on the residential parking space waiver, Appellee-Applicant may, of course, instead wish to propose additional garage levels, either in the proposed building or in (or below) any other structure on the merged parcel. Similarly, if any further appeal were to result from a DRB decision on such a renewed waiver request, or on proposals for additional parking, this Court would expedite the appeal under the provisions of V.R.E.C.P. 2(b), so that only a supplemental hearing on those new issues or proposals would be necessary.

The design of the entrance to and exit from the site replaces two existing curb cuts on each street with a single curb cut on each street, located as far from the intersection of Pine and College Streets as possible, in compliance with §10.1.12(c). The ability of drivers of vehicles exiting from the ATM lane to see pedestrians walking northerly on Pine Street is impaired by the corner wall of the building, as is the ability of pedestrians to know that a vehicle is about to exit from the ATM lane. Appellee-Applicant must therefore either design windows at the corner to allow northbound pedestrians to see drivers, and vice versa, or must install a warning buzzer or light to alert pedestrians that a vehicle may be exiting. Any such warning buzzer or light, or alternative window construction, or any other proposal to achieve the safety of northbound pedestrians, will also have to be submitted to the DRB in the limited remand, as it was not part of the proposal as presented to the Court. Vehicles in the pass-by lane have better visibility, but a stop sign must be installed at the intersection of that lane with the sidewalk, as well as signs warning pedestrians from both directions to watch for exiting vehicles.

Based on the foregoing, it is hereby ORDERED and ADJUDGED that the proposed project is conditionally approved, as discussed above, on condition that approval of the following matters must be obtained from the DRB:

1)      As a waiver is only granted of thirty of the required spaces, and as the lowest two spaces are not approved as designed, Appellee-Applicant shall obtain approval from the DRB either of additional waivers, or of revised parking plans showing additional parking spaces, either within the proposed building or as alterations to any other structures on the merged property, sufficient to meet the parking requirements discussed in this decision.

2)      Appellee-Applicant shall obtain approval from the DRB of a warning buzzer or light, or alternative window construction, or any other proposal sufficient to achieve the safety of northbound pedestrians at the intersection with the ATM exit lane.

After the conference discussed below, the Court will grant a limited remand of those aspects of the application to the DRB, if Appellee-Applicant wishes to make those applications, and will expedite any resulting appeal to this Court, under the provisions of V.R.E.C.P. 2(b), so that only a supplemental hearing on those new issues or proposals would be necessary.

On or before March 31, 2006, Appellee-Applicant shall provide a proposed judgment order, approved as to form by the other parties, accompanied by a complete set of corrected proposed plans as proposed to the Court at the hearing, as the labeling of exhibits comprising the different stages of the proposal admitted into evidence is confusing[19] at

---

[19] In particular, please be careful not only to label the levels of the garage properly, but to assure that the sheet number found in the lower right-hand corner of each sheet corresponds to the correct level. Exhibit 12 shows the lowest level of the garage but is labeled as Sheet "G1 - Garage Level One", while the corresponding sheet for the lowest

19

best. We will hold a telephone conference on March 13, 2006, to discuss the timing of the limited remand and to discuss whether the parties wish to discuss settlement of the remaining issues prior to the preparation of the judgment order or during the limited remand. The Court will provide the opportunity for the parties to engage in such discussions with the assistance of a mediator, bearing in mind the Court's prior rulings on the respective appellants' party status with regard to the various questions that would remain on remand.

Dated at Berlin, Vermont, this 3rd day of March, 2006.

_____
Merideth Wright
Environmental Judge

<hr>

level of the garage in an earlier proposal found in Exhibit 14 is labeled as Sheet "G2 - Garage Level One." The sheet for the middle level of the garage found in Exhibit 14 is labeled as Sheet "G1 - Garage Level Two," and was not provided on a full size exhibit. (An Exhibit 18 which was mentioned in connection with the middle level of the garage was not offered or admitted into evidence.) The sheet for the upper level of the garage and ground floor of the building is labeled as Sheet "A1 -First Floor Plan" on Exhibit 9, but as Sheet "A1 - Garage Level Three/First Floor Plan" on the corresponding sheet for the earlier proposal found in Exhibit 14. In addition, as noted at trial, Exhibit 9 contains some incorrect 'layers' provided in error, showing columns and a stairway not appropriate for the ground floor of the building, that could be confusing if referred to in the future by persons not aware of the testimony about that error. The van-accessible space should also be shown on these plans.